1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

COALITION FOR A SUSTAINABLE 520,

10

11                    Plaintiff,

12              v.

13  THE UNITED STATES DEPARTMENT OF
    TRANSPORTATION, FEDERAL HIGHWAY
14  ADMINISTRATION, a federal agency; DANIEL
    M. MATHIS, the Division Administrator;
15  FEDERAL HIGHWAY ADMINISTRATION,
    and THE WASHINGTON STATE
16  DEPARTMENT OF TRANSPORTATION, a
    Washington State agency,
17

18                    Defendants.

CASE NO. C11-1461RSM

ORDER ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT

19

20          Plaintiff Coalition for a Sustainable 520 ("the Coalition") brings this petition for review pursuant

21  to the Administrative Procedures Act, 5 U.S.C. § § 702, 704, and 706, asking the Court to review a Final

22  Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") made by defendants.  The

23  decision concerns a bridge to be constructed to replace the existing State Route 520 floating bridge

24  across Lake Washington, a large freshwater lake which separates the urban area of Seattle from the

25  urban areas of Bellevue, Redmond and Kirkland.  Plaintiff challenges the FEIS under the National

26  Environmental Policy Act  "(NEPA"), 42 U.S.C. § 4321 *et seq*., and Washington State Environmental

27  Policy Act ("SEPA"), RCW 43.21C.  Plaintiff also alleges the FEIS fails to comply with  a regulation

28  promulgated pursuant to the Federal Clean Air Act, specifically 40 CFR § 93.116, and Washington State

ORDER - 1

1   law regarding greenhouse emissions, RCW 70.235.020.

2        Defendant Federal Highway Administration ("FHWA") is the lead agency on the project and

3   issued the August 4, 2011 ROD which is challenged in this action.  Defendant Washington State

4   Department of Transportation ("WSDOT") is the state agency responsible for building, operating, and

5   maintaining the state highway system, including the SR 520 bridge.  WSDOT was designated as the lead

6   agency for environmental review of the project pursuant to the federal and state environmental policy

7   directives set forth in NEPA and SEPA.  Both FHWA and WSDOT are designated agencies responsible

8   for the June 2011 FEIS.

9        The matter is now before the Court for consideration of the parties' cross-motions for summary

10   judgment.  Dkt. ## 23, 32, 34.  The Court heard oral argument on July 10, 2012, and has fully

11   considered the positions and memoranda of the parties, together with relevant portions of the

12   administrative record.[1]  For the reasons set forth below, the Court shall grant defendants' motion for

13   summary judgment and deny plaintiff's motion.

14                     FACTUAL AND PROCEDURAL BACKGROUND

15        The genesis of the SR 520 bridge replacement project was the Trans-Lake Washington Study, a

16   technical report of which was published by WSDOT in November 1999.[2]  The study evaluated

17   transportation routes around and across Lake Washington, including the existing bridge crossings at SR

18   520 and the I-90 interstate freeway.  As described in the FEIS, in the Trans-Lake Washington Study,

19
20  for
21
> a 47-member stakeholder group evaluated a broad range of potential modes and routes crossing Lake Washington.  The concepts the group considered included new project corridors (for example, a crossing from Sand Point to Kirkland); different crossing methods, such as tubes and tunnels; new travel modes, such as ferries or rail; and the management of travel demand through tolling or land use changes.

22
23
> These concepts were screened, and the most promising were combined into "solution sets," which ultimately formed the basis for the alternatives evaluated in the Draft EIS.

24

25       [1] The voluminous administrative record in this matter was provided to the Court in electronic

26   format, on a portable hard drive.  The paper copy of the index to this record comprises 4,153 pages.
Dkt. # 20.  The "key" documents (Draft Environmental Impact Statement ("DEIS"), Supplemental

27   Environmental Impact Statement ("SEIS"), Final Environmental Impact Statement, and Record of
Decision were provided in hard copy, delivered in fourteen file boxes with three or four large binders in
each.  The FEIS fills thirty-four 3-inch binders of 500 to nearly 800 pages each.

28       [2] Administrative Record ("AR") 00004010-00004643.

The study recommended that the following configurations of SR 520 be carried forward as build alternatives:

— "Minimum Footprint" alternative (maintaining four general-purpose lanes with improved shoulders and bicycle/pedestrian access)

— Add one HOV[3] lane in each direction, for a total of six lanes

— Add one HOV and one general-purpose land in each direction, for a total of eight lanes

AR 00355174-75.

Public scoping for the project began in June of 2000.  The purpose of the scoping period is to notify those who may be affected by a proposed government action, which is governed by NEPA, that the relevant entity is beginning the EIS process.  This notice requirement ensures that interested parties are aware of and able to participate meaningfully in the entire EIS process, from start to finish.  *See, Northwest Coalition for Alternatives to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 594-95 (9th Cir. 1988).   In this case, WSDOT set up an informational website and hotline, distributed newsletters, and held community meetings and public briefings.  AR 00355175.

A broad range of alternative solutions was initially considered, with some, such as tunnels and fixed bridges, being quickly rejected as too costly or impractical in this earthquake-prone region.  AR 00355176.  A retrofit of the existing bridge to meet seismic standards and safety requirements, and to minimize the risk of sinking, was also rejected as not feasible.  *Id.*   The alternatives which advanced to consideration in the DEIS were the "no build" option, and four-lane, six-lane, and eight-lane configurations.  AR 000355177-78.  The eight-lane configuration was eliminated after additional evaluation, based on choke points which would be created at either end of the bridge, and prohibitive costs associated with reconstruction of interchanges at either end.  AR 00046464, AR00046599.

The DEIS was issued in July 2006.  AR 00046443-AR00051157.  As explained in the summary, replacement of the SR 520 bridge is considered necessary, due to the vulnerability of the aging bridge to windstorm and earthquake, and the very real possibility of catastrophic failure.  AR 00046457.  The goal of the bridge replacement project, as defined by the lead agencies, was described in the DEIS executive

---

[3] High Occupancy Vehicle

summary as follows:

> The purpose of the project is to improve mobility for people and goods across Lake Washington within the SR 520 corridor from Seattle to Redmond in a manner that is safe, reliable, and cost-effective while avoiding, minimizing, and/or mitigating effects on the affected neighborhoods and the environment.

AR 00046461.   In other words, as long as the State of Washington is going to build a new bridge, it should also be a better bridge in terms of mobility, safety, and reliability, but within the constraints imposed by cost and environmental concerns.

The DEIS compared in detail the "no build," four-lane, and six-lane alternatives with respect to the goals of improving mobility on SR 520 in a safe and reliable manner, while minimizing or mitigating effects on the environment and nearby neighborhoods.  AR 00046591- 00046887.   The 4-Lane Alternative was considered both with and without sufficient pontoon width to carry future high-capacity transit, and in either case had a pedestrian/bicycle lane in addition to the two traffic lanes in each direction.  AR 00046675.

The DEIS described the 4-Lane Alternative as follows:

> As its name suggests, the 4-Lane Alternative would have two 12-foot wide general-purpose lanes in each direction, the same number and type of lanes as today.  SR 520 and its bridges would be rebuilt from I-5 to Bellevue Way.  Roadside shoulders would meet current design standards, which for a 4-lane roadway require a 4-foot-wide inside shoulder and a 10-foot-wide outside shoulder.  New facilities would collect and treat stormwater runoff from the roadway surface.  WSDOT would build sound walls along much of SR 520 in Seattle and on the Eastside.  These sound walls would substantially reduce the effects of traffic noise on areas near SR 520.

> A bicycle/pedestrian path. would follow the north side of SR 520 through Montlake and across Evergreen Point Bridge, crossing to run along the south side of SR 520 through the Eastside to 96th Street Northeast.  The bicycle/pedestrian path is discussed in more detail later in this chapter.  The 4-Lane Alternative would also provide a new bridge operations facility for SR 520 beneath the east approach structure on the east shore of Lake Washington.  Other features of the 4-Lane Alternative would include electronically collected tolls and a flexible transportation plan.

> Tolls would be collected using data from transponders carried in vehicles.  This alternative would be designed to be compatible with the future addition of high-capacity transit in the SR 520 corridor.  (As noted earlier in this chapter, there is also an option to build the bridge with smaller pontoons that would not allow future high-capacity transit, although this would be inconsistent with regional transportation planning goals.)

AR 00046669 - 00046670.  The subsequent pages in the DEIS describe the design and configuration of

ORDER - 4

the 4-Lane Alternative in detail, including detailed diagrams.  AR 00044670 - 00044676.  After similar

detailed treatment of the configuration and design of the 6-Lane Alternative, the DEIS describes the

features which they have in common: a bicycle/pedestrian path with improved connections to existing

paths at the west end of the bridge, stormwater treatment,  a bridge operation facility, and tolls.  AR

00046696 - AR0046708.  The 6-Lane Alternative also had several different options for the interchange

area at the west end of the bridge, near the University of Washington.

Chapters 4, 5, 6, 7, and 8 of the DEIS compare the various alternatives in detail, including effects

on area-wide mobility, the surrounding neighborhoods, as well as construction effects and cumulative

effects.  AR 0046711 - 0046885.  Mobility and transit effects are considered and compared, using traffic

predictions for the year 2030.  AR00046712 - AR00046723.  Tables and diagrams reflect the demand

(the number of people and vehicles that wants to cross the lake on SR 520) and throughput (the number

of people and vehicles that is actually able to cross the lake on SR 520 at a particular time) for today and

for the year 2030.  The diagrams focus mainly on congestion at peak morning and evening commute

times.  AR 00046713 - AR00046719.  The DEIS explained that the addition of HOV lanes with the 6-

Lane Alternative would "allow substantially more people to use SR 520."  AR 00046715.  Although

demand would continue to exceed throughput with all alternatives considered, the 6-Lane Alternative

would meet more of the demand than the 4-Lane Alternative.  *Id*.  With respect to public transit, the 6-

Lane Alternative would better facilitate movement of people across SR 520 because of the HOV lane;

the "continuous HOV lanes would allow transit vehicles to bypass traffic congestion throughout the

corridor."  AR 00046721.  The 6-Lane Alternative would thus encourage more people to shift to buses

and carpools, as compared to the 4-Lane Alternative.  AR 00046722.

Chapter 4 of the DEIS also compared and contrasted environmental effects of the 4-Lane and 6-

Lane Alternatives, including geology, air quality, energy use, noise, and visual impacts.  AR 00046727 -

AR00046761.  Effects on air quality were found to be similar for the 4-Lane and 6-Lane Alternatives,

and both would result in an improvement over the No-Build Alternative, due to improved traffic flow

and reduced congestion.  "Moving vehicles operate more efficiently than vehicles that are idling or

moving slowly in stop-and-go traffic.  As a result, the total emissions of three primary pollutants

produced by motor vehicles—carbon monoxide, volatile organic compounds, and nitrogen

oxides—would be lower for both build alternatives than the No Build Alternative."  AR 00046728.

The DEIS also described the results of "hot-spot" analysis that was conducted by the project team for three intersection areas, at either end of the SR 520 project and at the Montlake and Lake Washington Boulevard interchange area.  "The analysis showed that there would be a decreasing trend in carbon monoxide concentrations over time.  In both 2016 and 2030, none of the alternatives or options would violate the National Ambient Air Quality Standards at any of the intersections, even though all of these intersections exceed the standards now."  AR 00046728.

The DEIS described mixed effects on historic, cultural, and environmentally-valued areas.  The 4-lane alternative would displace 16 structures to make way for project construction: two residences, four businesses, one dock at the Queen City Yacht Club, eight buildings at the NOAA Northwest Fisheries Center, and the Museum of History and Industry ("MOHAI").[4]  The 6-lane alternative would displace the same number and type of buildings, the only difference being one additional residence on the Eastside and one less residence in Seattle.  AR 00046741.  Effects on views at the Arboretum, at the west end of the bridge, would be both positive and negative.  *Id*.  Noise, air quality, and water quality would improve under both the 4-Lane and 6-Lane Alternatives at project area parks.  Neither alternative would interfere with access to parks and recreational properties.  *Id*.  The 6-Lane Alternative would temporarily affect 0.3 acres of parkland at the east end of the bridge, but it would be restored to parkland after the construction.  *Id*.

Parks and recreational properties which are protected by Section 4(f) of the Department of Transportation Act of 1966 (49 U.S.C. § 1653(f)) are addressed in detail in Chapters 5 and 7 of the DEIS.  Appendix P, the Draft Section 4(f) Analysis, contains the full analysis for both 4-Lane and 6-Lane Alternatives. AR 00045638 - AR 00049838.  Indirect and cumulative effects analysis for both alternatives appears in the record at Appendix J to the DEIS.  AR 00048657 - AR 00048758.

The "key findings"of the DEIS with respect to both build alternatives appear in the Transportation Discipline Report, found at Appendix J to the DEIS.  AR 00050018 - AR 00050416.  Comparing the two, the Key Findings section states as follows:

---

[4] A new MOHAI will open at Lake Union Park at the former Naval Reserve (Armory) building on December 29, 2012.  See, http://www.seattlehistory.org/splash.html

ORDER - 6

**4-Lane Alternative**

The 4-Lane Alternative is forecast to have fewer vehicles on SR 520 in 2030 than the No Build Alternative.  There would be a higher person demand for the SR 520 corridor; however, they would primarily travel in buses and carpools.

Even with the reduction in traffic volume crossing SR 520, I-5 is still forecast to operate over capacity and cause severe congestion on SR 520 in the westbound direction during the a.m. peak period.  This severe congestion would affect travel time for all traffic.  Carpools and buses would have a slightly shorter travel time than vehicles in the general purpose (GP) lanes due to the existing HOV lane between 124th Avenue Northeast and 76th Avenue Northeast.

One of the highly congested arterials in the project area is Montlake Boulevard, where congestion is caused by the Montlake Bridge drawbridge and the eastbound on-ramp.  The proposed eastbound on-ramp design would add one lane at the ramp meter, providing additional storage and serving more trips.  This design would eliminate the ramp meter backup onto the arterial.

The primary issue with the 4-Lane Alternative is that even if more buses were provided to serve the high transit demand, buses would not be served any faster than today because there would be no HOV lane in most of the corridor.

**6-Lane Alternative**

The 6-Lane Alternative would have the capacity to move more people in less time than both the No Build and 4-Lane Alternatives.  With the completed HOV lanes across SR 520, more people would be served per hour.  The average vehicle occupancy (AVO) for vehicles served across Lake Washington is 2.26, which is an increase compared to both the No Build Alternative AVO of 1.90 and the 4-Lane Alternative AVO of 2.18.  Compared with the No Build Alternative, GP travel times would decrease from 27 to 21 minutes between I-5 and 124th Avenue Northeast and HOV lane travel times would decrease from 23 to 10 minutes. This travel time is the bi-directional average of the peak 10 hours of the day (average of a.m. and p.m. peak periods).  Carpools and bus traffic would benefit greatly from this alternative with this substantially faster travel time.

This alternative would also eliminate backups from the eastbound on-ramp that extend back onto the arterial in the No-Build alternative.  This would be accomplished by providing two lanes for storage at the ramp meter and a higher service rate at the ramp meter.

This alternative would also remove the conflict points between the HOV lane and the on-ramps by moving the HOV lane to the inside lane.  GP vehicles entering and exiting the freeway would no longer have to cross through the HOV lanes in order to get to the GP lanes. With the 6-Lane Alternative, transit agencies could provide more frequent and more reliable bus service because buses would be able to bypass the congestion in the GP lanes.

AR 00050048 - AR 00050049.  As a result of this analysis, the DEIS concluded that while the 4-Lane Alternative would meet two of the project's goals, namely improving safety and reliability, its ability to meet the third goal of improving the movement of people and goods through the SR 520 corridor would

be "marginal."  AR 00046669.  It also would not meet the regional priority of improving the HOV system.  *Id.*  Following issuance of the DEIS, the formal public comment period was extended, so it lasted from August 18, 2006 to October 31, 2006.  AR 00133735.

Events which followed the 2006 publication of the DEIS are described in the January 2010 SEIS.

In December 2006, in a report entitled *A Path Forward to Action,* Governor Christine Gregoire identified the 6-Lane Alternative as the state's preference for the SR 520 corridor.  Governor Gregoire stated:

> I believe the needs of the regional transportation system will best be served by an alternative that replaces the four existing general-purpose lanes and adds two HOV lanes to strengthen regional transit services.  The ongoing environmental review process provides support for this approach.

However, the Governor noted the diversity of public opinions expressed in the Draft EIS and though public outreach efforts regarding the configuration and effects of the 6-Lane Alternative and its design options.  She concluded:

> The impacted communities on the west end of the project need to determine what design from Union Bay and westward to I-5 will best serve the neighborhoods, the University of Washington, and parks and natural resources.  City and community leaders and residents need to come together and develop a common vision on the best solution that fits the character and needs of the local communities.  I have asked WSDOT to provide support when requested for such a process.

In Spring 2007, responding to the Governor's request, the Washington State Legislature passed Engrossed Substitute Senate Bill (ESSB) 6099.  The bill directed the Office of Financial Management to hire a mediator and appropriate planning staff to develop a 6-lane corridor design for the Seattle portion of the project area.  Specifically, the bill directed the mediation group to prepare a project impact plan to address the impacts of the SR 520 Bridge Replacement and HOV project design on Seattle city neighborhoods and parks.  The bill also directed that the project impact plan provide a comprehensive approach to mitigating the impacts of the project, including incorporating construction mitigation plans.  It required that the plan be submitted to the Governor and the legislature by December 2008.

AR 00127630 - AR 00127631.

Mediation participants were identified through interviews with a broad range of stakeholders.  The mediation participants developed and reviewed a dozen design options for the configuration of SR 520 through Seattle, designated by letter as Options A through K.  AR 00127632.  Nine of these options were eliminated through the mediation process or screened out by WSDOT and FHWA during the previous NEPA analysis, or were merged into the remaining options.  Those were designated as Options A, K, and L in the final report.   AR 00127633.   WSDOT agreed to evaluate these three options in a

SEIS. *Id*.

In May 2009, Governor Gregoire signed Engrossed Substitute House Bill (ESHB) 2211, which authorized tolls on the existing SR 520 floating bridge and established a legislative workgroup to study the bridge replacement project proposals. The group was charged with the following responsibilities:

— Recommend design options that provide for a full SR 520 corridor project that meets the needs of the regions transportation system, while providing appropriate mitigation of neighborhoods and communities in the area directly affected by the project. . . .

— Review and recommend a financing strategy, in conjunction with WSDOT, to fund the projects in the SR 520 corridor that reflects the recommended design options.

— Present a final report with recommendations on the financing and design options to the legislature and the governor by January 1, 2010.

— Form a subgroup to conduct a detailed review of design options between I-5 and the west end of the floating bridge, consult with affected neighborhoods and community groups, and make recommendations.

AR 00127634. The workgroup met numerous times from July through December 2009, and also received input from the mediation participants. As a result of this process, a new option designated Option A+, emerged, adding ramps at Lake Washington Boulevard and an eastbound HOV direct-access ramp. *Id*. The workgroup made a draft recommendation to forward Option A+ to the Governor and the legislature as the preferred design option for the 6-Lane Alternative. *Id*.

The SEIS was issued by WSDOT and FHWA in January 2010. The report comprises 6611 pages. AR 00127528 - AR 00134139. The SEIS addresses the No Build and 6-Lane Alternatives, together with Options A, K, and L for the interchange area at the Seattle end of the bridge. See, AR 00133124. The Introduction to the SEIS explains why the 4-Lane Alternative was no longer being studied as a possible alternative.

The 4-Lane Alternative was identified in the Draft EIS as not fully meeting the project purpose and need. While it would improve safety by replacing vulnerable structures and widening lanes and shoulders, it would not meet the project purpose of improving mobility in the SR 520 corridor. Additional modeling using the updated traffic model for the SEIS confirms that the 4-Lane Alternative would provide substantially lower mobility benefits than the 6-lane alternative for both general purpose traffic and transit. Therefore the 4-Lane Alternative has been eliminated from further study.

AR 00127636.

Attachment 8 to the SEIS, the "Range of Alternatives and Options Evaluated," explains the

1   history of alternatives developed for the bridge replacement project, including public comment period

2   and mediation.  AR 00133661 - AR 00133759.  It describes, in summary form, the conclusion reached

3   in the DEIS that "the 4-Lane Alternative would meet only two of the projects key goals.  It would not

4   meet the third goal of increasing mobility for people and goods."  AR 00133735.

5          As stated in the SEIS, NEPA "allows lead agencies to identify a preferred alternative at the Draft

6   EIS stage or to wait until the final EIS is published."  AR 00133735.  Here, WSDOT and FHWA chose

7   to consider public comments to the DEIS before identifying a preferred alternative.  After the public

8   comment period, and the mediation and legislative workgroup described above, the agencies issued the

9   SEIS identifying the 6-Lane Alternative as the preferred alternative, but deferred selection of the

10  preferred design option for the westside interchange area.  AR 00133747.  After reviewing public

11  comments, WSDOT and FHWA identified a preferred alternative in April 2010.  AR 00355053.  As

12  described in the FEIS,

> The Preferred Alternative is most similar to SEIS Option A, but includes a number of
> features to reduce the neighborhood and park effects, improve regional and local transit
> connections, and enhance compatibility with potential future light rail transit in the corridor.

15  *Id.*  These features include a lid over portions of the roadway, together with landscape features.

16         The FEIS was approved May 26, 2011, and issued to the public a month later.  AR 00355118.

17  Apart from the executive summary (but including appendices) it comprises 26,178 pages.  AR 00355116

18  - AR 00381294.  The Record of Decision was issued August 11, 2011, representing the final decision of

19  the agencies.  AR 00400877 - AR 401410.

20         Chapter 2 of the FEIS describes the process of developing alternatives, and explains why the 4-

21  Lane Alternative was dropped from consideration.  AR 00355179, AR 00355 186.  It also describes a

22  "transit-optimized" 4-Lane Alternative which was proposed in comments to the DEIS, and explains why

23  that alternative did not merit further consideration.  AR 00355193 - AR 355194.  The proponents of the

24  "transit-optimized" 4-Lane alternative suggested applying tolls to reduce demand by general-purpose

25  travelers to the point where the remaining traffic, including transit, could flow freely across the bridge.

26  AR 00355193.  As explained in the FEIS,

> [t]o evaluate this suggestion, WSDOT performed travel demand modeling to determine
> what level of tolling on a 4-lane SR 520 would be required to achieve free flow.  As discussed

ORDER - 10

in the preceding section, the model used growth forecasts for 2030 that were based on adopted land use plans. The modeling results indicated that in order to achieve free flow on SR 520 with 4 lanes, peak-hour tolls on the bridge would need to be a minimum of $5.50. At this toll rate, enough traffic would divert from SR 520 to I-90 that I-90 would be well over its capacity; in effect, congestion would be transferred from one cross-lake route to the other. Congestion on I-90 would result in higher emissions of both criteria pollutants and greenhouse gases from vehicles operating at lower, less efficient speeds, and potentially in localized traffic effects from vehicles queuing at ramps or cutting through local neighborhoods in an effort to reduce travel time. In addition, this scenario would create a greater hardship for low-income populations using SR 520, who would need to choose either to pay a higher toll or to spend more time in the increased congestion on I-90. Tolling of I-90 in addition to SR 520 might balance congestion somewhat between the two lake crossings, but would likely result in non-free-flow conditions on SR 520 and a resulting continued disincentive to transit use. Finally, a 4-lane SR 520 is inconsistent with regional plans and policies, which over the past decade have continued to affirm the importance of completing the regional HOV system.

AR 00133194.

After explaining why the 4-Lane Alternative had been eliminated from consideration, the FEIS proceeded to analyze, in detail, the No-Build alternative and the 6-Lane Preferred Alternative. The Court will not describe or summarize this document, which was presented to the Court in 34 volumes, because the issue presented in this case is not what is contained in the FEIS, but what is missing from it. The parties have filed their cross-motions for summary judgment on the question of the adequacy of the FEIS under NEPA, SEPA and other relevant law.

ANALYSIS

I. **Summary Judgment Standard**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of identifying an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, it shifts to the opposition to present specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). A genuine issue exists if the non-moving party presents evidence from which a reasonable factfinder, viewing the evidence in the light favorable to that party, could resolve the material issue in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 282 (1986).

ORDER - 11

Summary judgment is particularly applicable to cases involving judicial review of a final agency action. *Occidental Engineering Co. v. INS*, 753 F. 2d 766, 770 (9th Cir. 1985).  Here, the parties are in agreement that the matter can be determined as a matter of law from the administrative record.  The standard of review shall be set forth below.

## II. Administrative Procedures Act, NEPA, and SEPA

Plaintiff Coalition brings this challenge to the FEIS under NEPA and SEPA pursuant to the Administrative Procedure Act ("APA").  Under this statute, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C § 702.  Defendants have not challenged the Coalition's standing as a person aggrieved or adversely affected.

The APA provides that this Court may set aside a final agency action if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law."  5 U.S.C. § 706.  This standard is "narrow," but the Court "must not 'rubber stamp' . . . administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. United States Corps of Engineers*, 361 F. 3d 1108, 1118 (9th Cir.2004) (quoting *Arizona Cattle Growers Association v. United States Fish & Wildlife*, 273 F. 3d 1229, 1236 (9th Cir. 2001.)  Thus,

> [An agency's decision is] arbitrary and capricious if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Auto Ins. Co*., 463 U.S. 29, 43 (1983).

Where review is not pursuant to authorization in the substantive statute (NEPA) but rather under the APA, the agency action must be final.  5 U.S.C. § 704.  "Final agency actions" are actions which (1) "mark the consummation of the agency's decision making process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennet v. Spear*, 520 U.S. 154, 178 (1997).  There is no dispute here that the FEIS and Record of Decision represent "final agency action" subject to review.

ORDER - 12

1    NEPA is a procedural statute which does not "mandate particular results but simply provides the
2    necessary process to ensure that federal agencies take a hard look at the environmental consequences of
3    their actions." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002); *see*
4    *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA was enacted with two
5    goals: "(1) to insure the agency will have detailed information on significant environmental impacts
6    when it makes its decisions; and (2) to guarantee that this information will be available to a larger
7    audience." *Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F. 3d 754, 758 (9th Cir.
8    1996).  These goals are satisfied once the agency completes its evaluation.  The statute thus  "exists to
9    ensure a *process,* not to ensure any result." *Id.*  (emphasis in original).  "NEPA does not set out
10   substantive environmental standards, but instead establishes 'action-forcing' procedures that require
11   agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley*, 214 F. 3d 1135, 1141
12   (9th Cir. 2000).

13   NEPA directs, among other requirements, that the agency must prepare an Environmental Impact
14   Statement ("EIS") for all actions which significantly affect the quality of the human environment.  *See*,
15   42 U.S.C. § 4332(2)(C).[5]  The EIS must include a comprehensive discussion of all substantial
16   environmental impacts and inform the public of any reasonable alternatives which would avoid or
17   minimize the adverse impacts.  *See*, 40 C.F.R. § 1502.1.  In assessing the adequacy of an EIS, the Court
18   applies the "rule of reason" standard, under which the Court considers whether the EIS contains a
19   "reasonably thorough discussion" of the "probable environmental consequences." *California v. Block,*
20   690 F. 2d 753, 761 (9th Cir. 1982*); Friends of Yosemite v. Norton*, 348 F. 3d 789, 801 (9th Cir. 2003).
21   The Court may not substitute its own judgment regarding the prudence of a proposed action for that of
22   the agency.  *River Runners for Wilderness v. Martin*, 593 F. 3d 1064, 1070 (9th Cir. 2009).  Thus, once
23   the Court is "satisfied that the proposing agency has taken a 'hard look' at a decision's environmental
24   consequences, the review is at an end." *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526
25   (9th Cir. 1997) (quoting *Idaho Conservation League v. Mumma*, 956 F. 2d 1508, 1519 (9th Cir.1992)
26   (citations omitted)).

27

28   [5] Where appropriate, a State agency may prepare the EIS for "any major Federal action funded under a program of grants to States."  42 U.S.C. § 4334(2)(D).

1    The basis of the Coalition's challenge to the FEIS and ROD is the assertion that the EIS "did not

2    rigorously explore and objectively evaluate all reasonable alternatives."  Plaintiff's Opening Brief, Dkt.

3    # 23, p. 12.  Plaintiff contends that because the FEIS omitted discussion of the 4-Lane Alternative,

4    including only the preferred 6-Lane Alternative and the No-Build Alternative, it is inadequate under

5    NEPA.   The Coalition acknowledges that the FEIS does discuss several alternatives for the interchange

6    at the west end of the bridge (the Montlake area), but argues that this does not cure the glaring defect of

7    failure to analyze the minimum-footprint 4-lane Alternative in that same document.

8    NEPA mandates that the agency provide a detailed statement regarding alternatives to its

9    proposed action.  *See*, 42 U.S.C. § 4332(2)(C)(iii).  The alternatives analysis is the "heart of the

10   environmental impact statement."  40 C.F.R. § 1502.14.  The regulation mandates that the agency shall

11   "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which

12   were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40

13   C.F.R. § 1502.14(a).   "Consideration of reasonable alternatives is necessary to ensure that the agency

14   has before it and takes into account all possible approaches to, and potential environmental impacts of, a

15   particular project."  *Northern Alaska Environmental Center v. Kempthorne*, 457 F. 3d 969, 978 (9th Cir.

16   2008).   The requirement ensures that the "most intelligent, optimally beneficial decision will ultimately

17   be made."  *Id.,* quoting *Calvert Cliffs' Coordinating Comm. v. United States Atomic Energy Comm'n*.,

18   449 F. 2d 1109, 1114 (D.C.Cir. 1971).   However, "an agency's consideration of alternatives is

19   sufficient if it considers an appropriate range of alternatives, even if it does not consider every available

20   alternative."  *Id*., quoting *Headwaters, Inc., v. Bureau of Land Management*, 914 F. 2d 1174, 1181 (9th

21   Cir. 1990).   Thus, the agency needs not "discuss alternatives similar to alternatives actually considered,

22   or alternatives which are 'infeasible, ineffective, or inconsistent with the basic policy objectives for the

23   management of the area.'" *Id*., quoting *Headwaters, Inc.,* 914 F. 2d at 1181 (citing *California v. Block*,

24   690 F. 2d 753, 767 (9th Cir. 1982)).

25   Plaintiff contends that the inclusion of only two bridge designs in the FEIS, the Preferred

26   Alternative and the No-Build option, does not meet the "range of alternatives" requirement, arguing that

27   a "single alternative is not 'a range.'" Plaintiff's Opening Brief, Dkt. # 23, p. 13.  While this argument is

28   logically appealing, it fails as a legal proposition.  The mandate of the regulation is that the agency

1   "rigorously explore and objectively evaluate all **reasonable** alternatives."  40 C.F.R. § 1502.14(a)

2   (emphasis added).  It does not use the word "range" or establish a minimum number of alternatives

3   which must be examined.  Rather, it mandates examination of the reasonable alternatives, together with

4   a brief explanation as to why other alternatives were eliminated from consideration.

5           As noted in the factual summary above, the 4-Lane Alternative was part of the original

6   consideration for the bridge replacement, as the minimum footprint option.  The 4-Lane Alternative was

7   explored and objectively evaluated in the DEIS.  The agency determined, on the basis of objective

8   analysis, that it did not meet the first of the project's three essential goals: that of improving the mobility

9   of people and goods across Lake Washington in the SR 520 corridor.  The 4-Lane Alternative was

10  therefore dropped from further consideration as a reasonable alternative, and the basis for that decision

11  was explained in the SEIS and FEIS.  The agencies also considered a "transit-optimized" 4-Lane

12  Alternative that was proposed in comments to the DEIS, and conducted modeling studies to determine if

13  this proposal would better meet the mobility goals of the project.  The agency determined that it would

14  not, and explained why in the FEIS.  AR 00133194.   Where the agency adequately explains its reason

15  for rejecting an alternative as required under 40 C.F.R. § 1502.14(a), it has satisfied the NEPA

16  requirement.  *Northern Alaska Environmental Center v. Kempthorne*, 457 F. 3d at 978.

17          The "rule of reason" analysis guides the choice of alternatives and the extent to which the EIS

18  must discuss each alternative.  *City of Carmel-by-the-Sea v. United States Department of*

19  *Transportation*, 123 F. 3d 1142, 1155 (9th Cir. 1997), citing *Citizens against Burlington v. Busey*, 938

20  F. 2d 190, 195 (D.C.Cir. 1991).   "The Environmental Impact Statement need not consider an infinite

21  range of alternatives, only reasonable and feasible ones."  *Id*.  The range of alternatives that is deemed

22  reasonable depends upon "the underlying purpose and need to which the agency is responding in

23  proposing the alternatives including the proposed action."  40 C.F.R. § 1502.13.

24          Plaintiff contends that the agency impermissibly narrowed the goal of the project by defining its

25  purpose as improving mobility for people and goods across Lake Washington **within the SR 520**

26  **corridor from Seattle to Redmond.**  The 4-Lane Alternative could not possibly meet the goal as stated,

27  because any proposed 4-lane solutions which would facilitate traffic flow on SR 520 would necessarily

28  limit the number of vehicles using that route, by tolling.  Plaintiff contends that had the project purpose

1    been simply stated as the movement of goods and people "across Lake Washington," then the 4-lane

2    Alternative could have fit the purpose:  some traffic would shift to I-90 to avoid the toll, while other

3    drivers would elect to join carpools or forgo their cars and use public transit.  This argument is

4    unavailing.

5          "The stated goal of a project necessarily dictates the range of reasonable alternatives and an

6    agency cannot define its objectives in unreasonably narrow terms."   *City of Carmel*, 123 F. 3d at 1155.

7    However, the goal of improving mobility in the SR 520 corridor is not an unreasonably narrow one; it

8    fits within the greater goal expressed in the Trans-Lake Washington Study and subsequent legislation of

9    improving traffic flow across Lake Washington on all routes.  In addition, the stated purpose of the

10   project is consistent with the larger regional priority of improving the HOV system throughout the

11   region.  In order to facilitate that goal, the project's purpose was framed with a focus on SR 520, where

12   no HOV lanes currently exist.   AR 00046669.

13         This Court may not substitute its judgment for that of the agencies.  The Court should uphold "an

14   agency's definition of objectives so long as the objectives that the agency chooses are reasonable . . . "

15   *Citizens Against Burlington,* 938 F. 2d at 195.  Where the Court has determined that the agencies took

16   the requisite "hard look" at the environmental consequences of the decision, the review is at an end.

17   *Oregon Natural Resources Council*, 109 F. 3d at 521.  The Court finds that the agencies did not

18   impermissibly narrow the stated purpose of the SR 520 bridge replacement project.   Instead, the

19   purpose of the project was reasonably defined to reflect the regional transportation needs into the future.

20   The Court will uphold the agencies' definition of the project's purpose as reasonable.  Further, the Court

21   finds that the elimination of the 4-Lane Alternative from further consideration after the DEIS was not

22   arbitrary and capricious nor an abuse of discretion, but was properly explained in the FEIS as required.

23   The Court will therefore uphold as reasonable, and compliant with NEPA, the discussion of alternatives

24   in the DEIS, SEIS, and FEIS.

25         Plaintiff raises additional objections to the FEIS, arguing that it did not adequately address

26   cumulative effects on wetlands, wildlife habitat, and recreational values.  The cumulative effects

27   analysis considers "the impact on the environment which results from the incremental impact of the

28   action when added to other past, present, and reasonably foreseeable future actions. . . ."  40 C.F.R. §

ORDER - 16

1  1508.7.  The cumulative effects analysis "must be more than perfunctory; it must provide a *useful*

2  *analysis* of the cumulative impacts of past, present, and future projects."  *Oregon Natural Resources*

3  *Council Fund v. Brong*, 492 F. 3d 1120, 1133 (9th Cir. 2007) (emphasis in original).  Here, cumulative

4  effects were considered in Chapter 7 of the FEIS.  AR 00355880 - AR 00355922.  The list of possible

5  related projects appears at AR 00355885.  Only three projects, the SR 520 Pontoon construction, the SR

6  520 Medina to SR 202, and the I-90 Two-Way Transit and HOV, bear any relation to Lake Washington

7  or the lakeside areas.  With respect to water quality, the FEIS noted that "due to requirements for

8  improved stormwater management and treatment of new development projects and the improvement in

9  stormwater treatment technologies" the combined effect of new projects in the area would be an

10  improvement in water quality.  AR 00355888.  After discussing past effects of human occupation on

11  Lake Washington, the section discusses the cumulative effects on water temperature, water quality, and

12  fish populations, noting that the project would not have a contributory effect on the current downward

13  trend in salmonid populations.  AR 00355892 - AR 00355895.  Under wildlife and habitat, the FEIS

14  notes that there are no Endangered Species Act listed species in the area of the project, although bald

15  eagles are protected under other statutes.  AR 00355896.  Wildlife in the area has been substantially

16  affected by development in the area, and will continue to be affected, but possible mitigation activities

17  are suggested.  AR 00355 897 - AR 00355898.  The balance of the chapter discusses cumulative effects

18  upon air quality, soils and geology, recreational resources, certain human populations, cultural

19  resources, transportation, and navigation on the lake, finding in most cases little or no cumulative effect,

20  or, as in the case of air quality, a slight benefit.  AR 003558998 - AR 00355918.

21          The Court finds that the cumulative effects section, while fairly brief, is adequate, in large part

22  because there are so few other future projects which would have an incremental impact to be considered

23  as cumulative to this project.  Thus there was little to add to the analysis of the impacts of the project

24  itself, which were extensively discussed in other sections of the FEIS.  The cumulative effects section

25  properly considered past effects and historical trends, and then discussed the effects of other projects

26  where appropriate.  Cumulative effects were further addressed in the 117-page Final Indirect and

27  cumulative Effects Discipline Report.  AR 00360652 - AR000360786.  The Court finds that this

28  treatment, when considered in the context in which it was presented, is adequate to meet the

ORDER - 17

1    requirements of NEPA.

2          Plaintiff also faults the analysis and treatment applied to Section 4(f) parklands and historical

3    and recreational properties.  Amended Complaint, Dkt. # 13, ¶ 34.  As noted above, properties which are

4    protected by Section 4(f) of the Department of Transportation Act of 1966 (49 U.S.C. § 1653(f)) are

5    addressed in detail in Chapters 5 and 7 of the DEIS.  Appendix P, the Draft Section 4(f) Analysis,

6    contains the full analysis for both 4-Lane and 6-Lane Alternatives.  AR 00045638 - AR 00049838.

7    Indirect and cumulative effects analysis for both alternatives appears in the record at Appendix J to the

8    DEIS.  AR 00048657 - AR 00048758.  The final Section 4(f) Evaluation appears in Chapter 9 of the

9    FEIS, and historic properties  are treated in detail in the attached Historic Built Environment Results

10   report.  AR 00355926 - AR 00356113; AR 00356683 - AR 00357959.  Historic properties and potential

11   historic properties are listed and shown in photographs the Historic Properties Inventory Report.   AR

12   00357950 - AR 00360299.

13         Section 4(f) does not require that the agency "circle back" to reconsider an option that it has

14   already ruled out as imprudent.  *Safeguarding the Historic Hanscom Area's Irreplaceable Resources,*

15   *Inc., v. Federal Aviation Administration*, 651 F. 3d 202, 213 (1st Cir. 2011).   Instead, the Section 4(f)

16   inquiry should focus on means of impact minimization that are "compatible with the alternative or

17   alternatives deemed feasible and prudent under 4(f)(1)."  *Id*., at 214.  The Section 4(f) analysis here,

18   with its original treatment of both 4-Lane and 6-Lane alternatives in the DEIS, together with exhaustive

19   treatment of the 6-Lane Alternative and Montlake Area options in the FEIS, is sufficient to meet the

20   statutory requirements.

21         The Court's findings on the NEPA issues are dispositive of plaintiff's claims under SEPA as

22   well.  Plaintiff acknowledges that "SEPA borrows heavily from NEPA" and reference to NEPA analysis

23   is appropriate when construing SEPA's requirements.  Plaintiff's Opening Brief, Dkt. # 23, p. 11, citing

24   *Eastlake Community Council v. Roanoke Assoc., Inc*., 82 Wash. 2d 475, 488 n. 5 (1973) and *Juanita Bay*

25   *Valley Community Association v. City of Kirkland*, 9 Wash. App. 59, 68 (1973).   Plaintiff asserts there

26   is a "defining distinction" in that SEPA "expressly recognizes that a healthful environment is a

27   'fundamental and inalienable' right."  *Id*. at p. 12, citing RCW 43.21C.020(3).  The Court acknowledges

28   this expression of the legislature's purpose in enacting SEPA.  However, plaintiff has not cited to any

1    authority which would guide the Court in analyzing the claims presented here any differently under

2    SEPA than it already has under NEPA.  Nor has plaintiff identified what additional substantive or

3    procedural protections might flow from that fundamental right.   Moreover, Washington courts have

4    held that an EIS which is sufficient to meet NEPA may also be used to satisfy SEPA requirements as

5    long as notice provisions have been met.  *Boss v. Washington State Department of Transportation*, 113

6    Wash. App. 543, 553 (2002); RCW 43.21C.150.  The Court accordingly finds that the FEIS is

7    sufficiently detailed to meet the requirements of SEPA.[6]  *Eastlake Community Council*, 82 Wash. 2d at

8    494.

9        **III.  Clean Air Act**

10            The Amended Complaint alleges that defendants did not adequately analyze "hot spots" for

11   carbon monoxide (CO) levels as mandated by 40 C.F.R. § 93.116.  Amended Complaint, Dkt. # 13, ¶¶

12   36, 37.  The "hot spots" which plaintiff would have preferred to be analyzed include the congestion

13   "choke point" at the west end of the floating bridge, the Montlake Lid, and the choke point where SR

14   520 meets I-5.  *Id*., ¶ 37.   As set forth in the Air Quality Discipline Report attached to the DEIS, the

15   agency chose three different "hot spots" to analyze for CO effects, as explained in the DEIS.  AR

16   00047118 - AR 00047119.  The locations chosen were "worst-case" intersections, based on modeling

17   predictions for the year 2030, and include the Mercer Street and I-5 ramps as well as Montlake

18   Boulevard and Lake Washington Boulevard.  *Id*.  Maximum 1-hour CO concentrations at the three

19   locations under each of the alternatives under consideration at the DEIS stage were calculated using a

20   methodology described thoroughly in the DEIS, and were presented in table form.  AR 00047119 - AR

21   47123.  The data giving rise to the figures in the table appear in the DEIS at AR 00047136 - AR

22   00047260.  The DEIS concluded that

> [a]lthough the 2000 modeled concentrations are above the 8-hour [National Ambient Air
> Quality Standards] of 9 ppm at all three intersections evaluated, the results for the alternatives
> in subsequent years show a decreasing trend in CO concentrations.  The project would neither
> cause new violations of the 10-hour or 8-hour CO NAAQS in future years, nor increase the
> frequency or severity of any existing violation.

---

[6] WSDOT asserts that it is immune from suit under SEPA in federal court due to the Eleventh
Amendment.  The court did not need to reach this issue in resolving the SEPA claims, and will address
it below under plaintiff's remaining state law claims.

1   AR 00047122.

2        Plaintiff's allegation of violation of the Clean Air Act amounts to no more than a disagreement

3   with the choice of locations to be monitored for CO.  Such a disagreement over methodology does not

4   give rise to a claim under NEPA.  *See, e.g.*, *Friends of Endangered Species. Inc. v. Jantzen*, 760 F.2d

5   976, 986 (9th Cir. 1985) ("NEPA does not require that we decide whether an [environmental review] is

6   based on the best scientific methodology available, nor does NEPA require us to resolve disagreements

7   among various scientists as to methodology."); *Laguna Greenbelt Inc. v. United States Dep't of Transp*.,

8   42 F.3d 517, 526 (9th Cir. 1994) ("NEPA does not require us to decide whether an EIS is based on the

9   best scientific methodology available or to resolve disagreements among various experts.") The claim

10  under the Clean Air Act is accordingly without merit.

11        **IV.  State Law Claims**

12        The Amended Complaint asserts state law claims under RCW 70.235.020, which sets limits on

13  greenhouse gas emission, and RCW 47.06.130, which sets standards for budgeting and cost-benefit

14  analysis for state transportation projects.  Amended Complaint, Dkt. # 13, ¶¶ 38, 39, 40.   As to these

15  claims (as well as SEPA), WSDOT has asserted the bar of Eleventh Amendment immunity. "The

16  Eleventh Amendment has been authoritatively construed to deprive federal courts of jurisdiction over

17  suits by private parties against unconsenting States."  *Seven Up Pete Venture v. Schweitzer*, 523 F. 3d

18  948, 956 (9th Cir. 2009), citing *Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996).  The Eleventh

19  Amendment bars suit against a state agency, such as WSDOT, regardless of the relief sought.  *Pennhurst*

20  *State School & Hosp. v. Halderman*, 465 US. 89, 100 (1984).  Thus, it applies to suits seeking injunctive

21  relief against WSDOT as well as to suits for damages.  *Id*. at 101-02.  However, a suit may be brought to

22  enjoin a state official, rather than the State or its agency itself.  *Ex Parte Young*, 209 U.S. 123 (1908).

23        In arguing against the Eleventh Amendment bar to suit, plaintiff asserts that Washington has

24  consented to this suit by accepting federal funds for the bridge replacement project and by jointly

25  participating in the preparation of the EIS.  Plaintiff acknowledges that the mere acceptance of funds,

26  without more, does not signify consent to suit, and has cited no authority for the proposition that joint

27  preparation of the EIS would establish consent to suit in this Court for alleged violation of state laws

28  which are independent of and unrelated to the NEPA process.   Absent demonstration of such consent,

plaintiff has failed to overcome the Eleventh Amendment immunity accorded to WSDOT.

Plaintiff asks that it be allowed to amend the complaint to name Paula Hammond, Secretary of the Washington State Department of Transportation, in lieu of WSDOT to establish jurisdiction for injunctive relief under *Ex Parte Young*. The Court declines to allow leave to amend. Plaintiff has established neither that there is any private right of action under the two state laws invoked, nor that these laws can be enforced against the Secretary as opposed to the agency itself. Amendment at this time to allow pursuit of these claims would be untimely and may well be futile.

CONCLUSION

The voluminous record in this matter reflects great concern on the part of defendants for the impact of the SR 520 replacement bridge project upon the environment and the community, as to the immediate neighborhood of the bridge itself and the greater regional community which will use the bridge. Plaintiff has not challenged the decision to replace the existing bridge; the dispute is over the choice of design and footprint for the new bridge. Through the analysis set forth above, the Court is satisfied that the agencies have taken the requisite "hard look" at the environmental consequences of the proposed project. The Court finds that the FEIS and ROD in this matter fulfill both the letter and the spirit of NEPA and, by analogy, of SEPA. The Court also finds that the elimination of the 4-Lane Alternative from consideration after the DEIS was neither arbitrary, capricious, nor an abuse of discretion. Further, the Court finds that plaintiff's claims under the Clean Air Act are without merit, and that the state law claims against WSDOT are barred by the Eleventh Amendment.

Accordingly, it is hereby ORDERED:

(1) Plaintiff's motion for summary judgment (Dkt. # 23) is DENIED;

(2) Both defendants' motions for summary judgment (Dkt. ## 32, 34) are GRANTED; and

(3) This action is DISMISSED.

The Clerk shall enter judgment in favor of defendants on all claims.

DATED this 25 day of July 2012.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE